## WATSON ET AL. v. VINSON ET AL.

[67 South. 61.]

1. **TAXATION.** *Tax title. Defects in assessments. Curative statute. Tenancy in common. Purchase of adverse interest. Co-tenants. Ouster. Estoppel. Essentials. Knowledge of facts. Title of grantor.*

   Where the tax rolls for 1875 were not returned by the assessor to the board of supervisors within the time required by Laws 1875, chapter 26, nor within the additional time granted by Laws called session 1875, chapter 3, and the roll was never approved by the board of supervisors as required by those acts, a sale of lands for the nonpayment of taxes was void.

2. **SAME.**

   Such a sale was not cured by Laws 1876, chapter 149, empowering boards of supervisors to make new assessments or to correct and equalize incorrect assessments, where there is no evidence that the supervisors did either.

3. **TAXATION.** *Tax. Sales. Limitation.*

   Where one purchased land at a void tax sale and afterwards bought, in the name of his wife, the outstanding title to settle a suit against him to set aside the tax sale before such action was barred by the three-year statute of limitations provided by Code 1880, section 539, the husband in such case, did not thereafter hold the land adversely to his wife, so that the rights of the children as her heirs were barred by that statute.

4. TENANCY IN COMMON.  *Purchase of adverse interest.*
   Where a husband joined his wife in a deed of trust upon her land
   and after her death, while the children were all minors, pur-
   chased the land at a sale under such trust deed in his own name,
   his purchase inured to the benefit of his children who were co-
   tenants with him.

5. TENANCY IN COMMON.  *Adverse possession.  Co-tenants.  Ouster.*
   In such case the husband did not secure the entire title by adverse
   possession against the children, where they continued to live
   with him until maturity, and there was no evidence that he ever
   repudiated his joint tenance with them or in any manner ousted
   them therefrom.

6. ESTOPPEL.  *Essentials.  Knowledge of facts.  Title of grantor.*
   Where the children in such case did not know that the land was
   owned by their mother at her death, or that they were entitled
   to an interest therein as her heirs, they were not estopped by
   their silence from asserting their claim against grantees under
   deeds of trust given by their father.

APPEAL from the chancery court of Holmes county.
HON. J. F. McCOOL, Chancellor.

Suit for partition by A. J. Vinson and others against
Fannie M. Watson and others.  From a decree ordering
a sale for partition the defendants appeal.

*Watson & Perkins,* for appellant.

The assessments of lands in Holmes county for 1875
was unassailably good by the action of the board of super-
visors of the county in 1875 and 1876, faithfully comply-
ing with the provisions of the curative Acts of 1875 and
1876 (July 31, 1875; February 26, 1876).  The Acts re-
ferred to were designed by the legislature to have the
effect of thus validating the assessment, if complied with
in all respects.  As a necessary consequence, the sale to
R. H. Watson on March 4, 1876, depending, in part, upon
the validity of the assessment under which it took place,
and only attacked in respect to said assessment, was a
valid sale and when the one year redemption period

passed, as prescribed by law, and the tax deed was re-corded, the title to section 34 vested absolutely in the vendee of the tax purchaser, Dr. J. H. Watson.

Dr. Watson purchased the land for cash in 1878 and went into possession in the fall of that year. As long ago as 1892 his title was believed by counsel for ap-pellees to be good. The flight of time has certainly made it no worse. It is not liable to attack at any point. Tax titles were at that time regarded as precarious, so he supplemented his tax title by buying in the bottom title, which Judge Campbell says, in the *Jonas Case,* 77 Miss. 588, "did not impair it". His life long adverse posses-sion of the land is shown by the testimony of Mr. War-mack and Squire Maxwell. (Tr. ,pp. 154, 172.) Being already in possession, Dr. Watson was not under the necessity of using the remedy of unlawful entry and de-tainer, granted tax purchasers by section 44, Acts 1876, p. 151. This Act was construed as a statute of limita-tions in *McLemore* v. *Scales,* 68 Miss. 50, 51.

The case brought by appellees is merely speculative. They assert rights derived from their mother that she never claimed and her silence on the matter, otherwise unaccountably strange, repudiates the pretended claims of appellees.

Appellants, I submit, are justly entitled, under the showing made in this record, to have the bill dismissed, at the cost of appellees.

*Noel, Boothe & Pepper,* for appellee.

The tax sale of March 4, 1878, based on the land roll of 1875, was void, because (1) it was filed in two parts, as shown by the auditor's copy of roll and the auditor's certificate, originals of which are before this court; that one part of the roll, containing only the land in towns, was filed at the regular September meeting, 1895, and the other part about December 1, 1895; and (2) because these rolls were never approved by the board of super-

visors of Holmes county, Mississippi. The Revenue Laws of 1875, p. 49, required the land roll to be returned by the first Monday of June, 1875, the time being extended by an Act of July 31, 1875, to the fourth Monday of August, 1875, when the board of supervisors were required to meet in special session to receive, revise, correct and equalize the assessment so that the rolls should, by certified copies, be forwarded to the auditor, on or before the last Monday in September, 1875.

The failure to file or approve or certify the land assessment rolls, at the time prescribed by law, nullifies sales under such assessment. *Carlisle* v. *Good,* 71 Miss. 455; *Preston* v. *Banks,* 71 Miss. 602; *Carlisle* v. *Chrestman,* 69 Miss. 392; *Fletcher* v. *Trevalla,* 60 Miss. 903; *Stovall* v. *Conner,* 58 Miss. 138; *Mullens* v. *Shaw,* 77 Miss. 707; *Fanning* v. *Funchess,* 60 Miss. 541. The Stovall case referred to, was for a sale made on the same day, March 4, 1878, as the Watson sale, under the same laws, and the sale was vacated because the roll was not filed and approved as required by law.

Exercise of the power of raising or reducing assessments, by the board of supervisors, is unlimited, till the assessment roll is approved, and qualified afterwards except where qualifications, by special act, is removed for a time but constitutes no approval of land assessment.

By the common law, in legal contemplation, the husband and wife are considered but one person, her legal existence and identity, during marriage, being merged in that of the husband, who was entitled to the uses and profits of her land, and could convey or incumber his interest in his wife's real estate during her life, or his tenancy by courtesy after her death. Such alienations or incumbrances of her estate could not prejudice the ultimate rights of the wife or her heirs, only his individual estate being so affected.

During the first year of their married life, 1880, all common-law disabilities of married women were swept

away; and by section 1177 of the Code of 1880, the husband was constituted her agent and manager in business, for farming and other operations in which her land or means were used, unless a contract changing the relation, evidenced by writing subscribed and acknowledged, should be filed for record in the office of the chancery clerk, where such business was done.

The evil intended to be thus remedied was becoming a frequent occurrence. Husbands of the owners of land would operate the lands in their own names. If the business became unprofitable, the wife would escape liability for the debts of the business "by the easy device of setting up secret arrangement or contract, by the terms of which it would be shown that the property had been leased or hired to the husband and the business transacted as his own and for his exclusive benefit". Even where land owned by the wife was operated by a doctor in large practice, and in his own name, he owning everything but the land, and regarded by his creditors as owning that, the business and its proceeds belonged to the wife, though it was done without her consent, and she was liable for the debts, and her acquiescence could enlarge such agency. *Porter & MacRae* v. *Staten,* 64 Miss. 424-6; *Ross* v. *Baldwin,* 65 Miss. 575; *Johnson* v. *Jones,* 822 Miss. 485.

This defense is unavailable. While Dr. J. H. Watson purchased of R. H. Watson through a quitclaim deed, for one hundred fifty dollars, his interests in the lands in controversy, that interest was dormant for one year, after the tax sale of March 4, 1878. Before three years had elapsed the record title undisputed, of J. T. Williams was acquired by P. Simmons and W. A. Drennan, and a suit was brought in the circuit court of Holmes county against Dr. J. H. Watson for this land, and he had J. M. Maxwell summoned as a witness and who attended the circuit court in 1880 or 1881. Before the case was tried, Dr. Watson told his witness, Maxwell, to go home, "that he would compromise the matter." About

that time the holders of the indisputable legal title to the land in controversy, P. Simmons and W. A. Drennan, in consideration of six hundred forty dollars, gave warranty deed to Mrs. Abbie T. Watson, wife of J. H. Watson. The six hundred and forty dollars was borrowed from J. H. Levy, on the joint note of Dr. J. H. and Mrs. Abbie T. Watson, secured on this land. (Exhibit B to E. F. Noel's deposition.) Upon Dr. J. H. Watson's wife's acquisition of the legal title, his hostile and adverse holding ended. In law and in fact as shown on the preceding page, point II, he became his wife's agent, legal ownership following the record title, regardless of private and unrecorded agreements. "Under this ten-year statute it is the adverse possession that confers title or ownership. The same is true as to the statute under consideration." (Section 539.) "The essential elements which are necessary to constitute an effective adverse possession are generally recognized. The occupancy must be hostile, actual, open and notorious, exclusive and continuous for the statutory period."

"Both parties cannot be seized at the same time of the same land under different titles. The law therefore, adjudges the seizin of all that is not in the actual occupancy of the adverse party to him who has the better title."

Where the husband makes deed of property to his wife to defraud his creditors, by inserting her name in the place of his, by unauthorized change as grantor in deed, or deed is taken to her from same grantee prior to deed to him, or deed be taken to her direct, or true title becomes vested in her by any means, then the joint possession becomes the possession of the one who holds the superior title, whether they live on the property or not; and so continues, after the death of holder of the superior title, and in favor of such holder's heirs. *Hill* v. *Nash,* 73 Miss. 849; *Claughton* v. *Claughton,* 70 Miss. 384; *Massey v. Rimmer,* 13 So. 832; *Day* v. *Cockran,* 24 Miss. 261; *Smith v. Cunningham,* 79 Miss. 425.

In the Claughton case, the court regarded as frivolous the contention that as between husband and wife, the possession was not that of the one holding the superior title. The court held in the Smith-Cunningham case that fifty years' use and possession of the property by the widow was not adverse to the title of the husband who died in possession. In the Hill case the wife's title was held superior to that of her husband, both having deeds to the property; and their living elsewhere, while he was in ostensible possession of the property, and selling it, was held not adverse to her and her children till death ended his curtesy rights.

The purchase of Dr. J. H. Watson of the land deeded to his wife by Simmons and Drennan under foreclosure of a deed of trust given to secure the purchase money advanced by J. H. Levy, gave no better title nor greater interest than what he had inherited from his wife. *Wyatt* v. *Wyatt*, 81 Miss. 228; *Beaman* v. *Beaman*, 90 Miss. 766; *Jonas v. Flanniken*, 69 Miss. 588.

As between cotenants generally, especially where filial relations and membership of the same household exist, the possession of one is regarded as the possession of all; it does not become adverse or hostile until brought to the notice of the other cotenants, and amounts, as to them, to such ouster as entitles them to sue; adverse outstanding title acquired by a cotenant inures to all, especially where all derive directly from the common source.

The allegations of appellees that they were kept in ignorance of their rights as cotenants of their father, until accidental discovery after his death, is undenied and is proved. This case falls squarely within the general rule, "that the representation or concealment relied on to sustain an estoppel must have been made with full knowledge of the facts by the party to be estopped." Am. & Eng. Enc. Law (2 Ed.), 433; *Mortgage Co.* v. *Bunckley*, 88 Miss. 648-50; *Houston* v. *Witherspoon*, 68 Miss.

195-6; *Hill* v. *Nash,* 73 Miss. 850; *Jonas* v. *Flanniken,* 69 Miss. 586.

REED, J., delivered the opinion of the court.

This case involves the title to section 34, township 16, range 2 west, in Holmes county. In 1875 the land was owned by James T. Williams. In that year it was assessed to him. On March 4, 1878, it was sold by the sheriff and tax collector of Holmes county for the non-payment of taxes for 1877, and purchased by R. H. Watson. On October 5, 1878, R. H. Watson conveyed it to Dr. J. H. Watson. On February 7, 1880, James T. Williams, who owned the bottom title to the land, conveyed it to Peter Simmons. On March 3, 1880, Mr. Simmons conveyed an undivided one-half interest therein to W. A. Drennan. Messrs. Simmons and Drennan then borught suit to recover the land from Dr. J. H. Watson. This case appears to have been compromised, and on November 22, 1881, Messrs. Simmons and Drennan conveyed the land to Mrs. Abbie T. Watson, the first wife of Dr. J. H. Watson, for the consideration of six hundred and forty dollars. On December 15, 1881, Mrs. Watson and her husband executed a deed of trust on the land to secure a loan of six hundred and forty dollars, "money advanced for the purchase price" thereof.

Dr. J. H. Watson married Miss Abbie Vinson, his first wife, in January, 1880, and she died in January, 1884, leaving surviving her three infant children, the oldest being about three years old, and the youngest about one week. In 1886 Dr. Watson remarried; his second wife being Miss Fannie Smith. On February 17, 1887, there was a sale of the land under foreclosure of the deed of trust, and it was purchased by Dr. Watson, who took the title in his own name. In 1878 the land was un-cleared. Soon after the conveyance to him of the tax title, Dr. Watson began to clear and improve it. He continued in the use and control of the land till his death, which occurred July 11, 1912. For a time he resided

on the land. This property was devised by him to his second wife, Mrs. Fannie M. Watson, who survived him.

Appellees, who are the children of Mrs. Abbie T. Watson, the first wife, knew nothing of the deed from Messrs. Simmons and Drennan to their mother till after the death of their father. Soon after acquiring this information, they brought suit in chancery seeking to be declared owners, each of one-fourth undivided interest in the land and praying for partition.

Dr. Watson had from time to time executed deeds of trust on the land to secure loans. At the time of his death several of these were unpaid, among them the deeds of trust in favor of appellants William Wormack and the Colonial & United States Mortgage Company.

The chancellor upon hearing sustained the bill of complaint, decreed a sale for partition, and restricted the incumbrances to the one-fourth undivided interest which it was held was the share of Dr. Watson. The chancellor held that the tax deed to R. H. Watson was void. This appellants claim to be error. The tax sale was made under the assessment in 1875. By act of the legislature approved March 6, 1875 (chapter 26, Laws of Mississippi of 1875), the tax assessors of the several counties were required to return their assessment books to the clerks of the board of supervisors on or before the 1st day of June, 1875, and annually thereafter. The tax assessor of Holmes county failed to comply with this law in 1875. There was a second session of the legislature in 1875 which was convened on July 27, 1875. By act approved July 31, 1875 (chapter 3, Laws of Mississippi Called Session 1875), the tax assessors in the counties where the assessment rolls had not been received and approved were required to file such rolls with the chancery clerk on or before the fourth Monday of August, at which time the board of supervisors were required to meet to receive, revise, correct, and equalize the rolls, and that certified copies be forwarded to the auditor on or before the last Monday in Sep-

tember, 1875. This statute was not complied with. The land rolls in Holmes county were not received by the board until the September meeting, 1875. Then the fourth Monday of September was set as the time to hear objections and equalize the assessments. The land roll was sent to the auditor and filed with him in two parts, the first containing lands in town following the September hearing, and the second purporting to contain the balance of the lands in December, 1875. There was no approval by the board of supervisors of the land roll in 1875 or 1876.

It is contended by the appellants that an act of the legislature passed February 26, 1876 (chapter 149 of the Laws of Mississippi of 1876), cured the errors in the 1875 assessment. This act was for the purpose of authorizing the making of corrections on assessment rolls because they were "full of errors, informalities and improper assessments." The board was empowered to order a new assessment of the real estate, or could make corrections and equalizations on the rolls then in use. No new assessment was ordered in Holmes county in 1876, and the roll of 1875 was not approved. The only information we have of the board doing anything with land assessments in that county in 1876, the courthouse of the county and all records therein having been destroyed by fire in 1893, is from several loose sheets in the state auditor's office which contain a certificate by the chancery clerk that they constitute a copy of the changes and reductions in land assessments made by the board at the July term, 1876. There is nothing to show on these sheets that the board held a meeting at the time specified for the purpose of correcting the roll and equalizing the same. On the sheets referred to it is only shown that certain reduction were made in certain individual assessments. The dealing with the roll in 1876, as shown in this case, is not curative of the errors in 1875. There is nothing on these sheets to show

108 Miss. 39

approval of the roll. This should be done by order of the board of supervisors, and there is no order. It is in proof that no order of approval was made in either 1875 or 1876. The errors in the assessment of 1875 have not been cured.

. We do not see any error of the chancellor in holding that the tax deed failed for the reason that, quoting from the final decree:

"The land tax roll upon which said sale was based was not filed and approved in the manner provided by law." *Stovall* v. *Conner,* 58 Miss. 138; *Fletcher* v. *Trewalla,* 60 Miss., 963; *Mitchum* v. *McInnis,* 60 Miss., 945; *Carlisle* v. *Chrestman,* 69 Miss., 392, 12 So. 257; *Carlisle* v. *Goode,* 71 Miss., 455, 15 So. 119; *Preston* v. *Banks,* 71 Miss. 602, 14 So. 258.

Appellants claim that appellees are barred by the three-year statute of limitations (section 539, Rev. Code 1880). The statute did not begin to run until one year from the day of the sale, which put it in operation March 4, 1879. Before the expiration of the three years the deed had been made to Mrs. Abbie T. Watson, the first wife of Dr. Watson, by which she was conveyed the legal title to the land by the owners thereof. This conveyance followed, and apparently was in settlement of an action brought by such owners to recover the land from Dr. Watson. It is shown that the transaction whereby the legal title was vested in his wife was conducted and consummated by Dr. Watson. Surely it was his purpose to make his wife the legal owner of the land. He may have gone into possession and claimed the land under the tax title which he at the time believed to be good, but it is clear that, when it became necessary to purchase the good title to the land; it was taken in the wife's name, and from then on the holding and occupation was properly under her title. Only a few days after the conveyance to Mrs. Watson, her husband joined her in executing a deed of trust on the very land to secure a loan for the purchase money paid Simmons and Dren-.

nan, the grantors. Under the facts of this case it cannot be said that Dr. Watson was holding and claiming the land adversely and against his wife. The three years' actual occupancy was interrupted when Dr. Watson purchased the land for his wife, and the title became vested in her.

Dr. Watson did not acquire full title to the land at the sale in foreclosure of the deed of trust given by his former wife, then deceased, and himself. When Mrs. Watson died in 1884, intestate, her three children, all very young, and her husband, were her heirs at law, and they together inherited the land, each receiving an equal interest. His purchase of the land under the deed of trust inured to the benefit of all the cotenants. The title remained in the four as before the sale.

Dr. Watson did not obtain entire title through adverse possession against his cotenants. These cotenants were his own children. When they, with their father, acquired title upon the death of their mother, they were mere babies. They were still very young when their father remarried, and still in early childhood when he attempted to obtain title by purchase in his own name at a foreclosure sale. They were certainly for some years after this in his household, subject to his control, under his care, and entitled to his support and guidance. There could be no running of the statute of limitations against them until they reached their majority. Then because of the relation of cotenancy, there must be proof of an ouster. We do not find this. In the beginning the father's holding was certainly for his children as well as himself. We do not find it shown that there was any change in the manner of his possession and use. It was the same after his children grew up as when they were young. He never told his children that the legal title to the land was in their mother when she died. It has not been shown that

the father at any time, by notice or act, expressed to his children thaat he was claiming exclusive possession, and denying their right. to any interest. There is no proof of repudiation or disavowal by Dr. Watson of the relation of cotenancy with his children. No hostile occupancy has been shown. The facts in this case do not show that Dr. Watson, the parent, secured for himself the whole title to the land by adverse possession against his children.

It is claimed that appellees are estopped from questioning the rights of the loan holders to subject the entire title in the land to the collection of their indebtedness secured by deeds of trust executed by Dr. Watson. Appellees were in complete ignorance of their rights. They did not know until after their father's death, of the conveyance to their deceased mother, and that they inherited interests in the land from her and were cotenants with their. father. The decision of this case as to this point is controlled by the holding of the court in the case of *Mortgage Co.* v. *Bunckley,* 88 Miss. 641, 41 So. 502. In that case it was claimed that one of the parties was estopped by conduct, because he was at the home of his father when the agent of the mortgage company was there to inspect the land for a loan of money to the father, who claimed to own all of the title thereto, and that he knew of the proposed loan, and was silent as to any claim of his own to the land. Deciding that this did not constitute an estoppel, the court, speaking through Special Judge CAMPBELL, said: "The question is: Is he estopped by his silence? The truth is he did not know that he had any interest in the land. As stated by counsel for the mortgage company, 'It was not considered in the family at that time, nor until after 1893, that the children of Nathan had any interest whatever in the property in controversy.' His ignorance of his rights precludes the claim of estoppel by his mere silence. 11 Am. & Eng. Ency. Law, 433, 434b, and cases cited; Pomeroy, Eq. Jur., sec. 805;

*Houston* v. *Witherspoon,* 68 Miss. 190, 8 So. 515; *Hignite* v. *Hignite,* 65 Miss. 447, 4 So. 345, 7 Am. St. Rep. 673; 7 Ballard on Real Property. p. 40. Apart from this, it is by no means certain that he knew of the loan being effected, and if he did, he was under no legal obligation to assert his claim, to interfere with the success of his father's application for a loan.''

Appellants rely upon the case of *Smith* v. *McWhorter,* 74 Miss. 400, 20 So., 870, to sustain their position concerning the estoppel of appellees. It was therein decided, quoting from the headnote, that:

"A tenant in common who purchases the joint estate under a deed of trust will hold the same as trustee for all the tenants; but adult cotenants, with knowledge or sufficient information to charge them with knowledge, must elect within a reasonable time to hold the purchaser as a trustee; otherwise those who acquire rights in the property from him in good faith will be protected.''

In that case it appears that the parties were all of age when the arrangement was made by which the one tenant in common took the title in her name. In the case at bar appellees, the cotenants, were minors of tender years when the title by purchase at the trustee's sale became vested in their father and cotenant.

Following the decision in the case of *Mortgage Co.* v. *Bunckley, supra,* we hold that appellees are not estopped.

*Affirmed.*